## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **JANE-HUMBLE ISD DOE,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **C.A. No. 4:18-cv-00079** |
| | § | |
| **HUMBLE INDEPENDENT SCHOOL** | § | |
| **DISTRICT,** | § | |
| | § | |
| *Defendant*. | § | |

## PLAINTIFF'S FIRST-AMENDED COMPLAINT

Plaintiff **JANE HUMBLE-ISD DOE**, files this "Plaintiff's First-Amended Complaint" as follows against the foregoing described Defendant and respectfully shows as follows:

## I.    NATURE OF SUIT

1.    JANE HUMBLE-ISD DOE is a minor that suffered serious injuries as a result of the intentional denial of Plaintiff's rights under various laws of the United States. This is a civil action for compensatory and punitive damages to redress the blatant, egregious, and intentional actions of Defendant Humble-ISD which constitute (a) violations of the *Child Find* obligations found within the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq.; (b) violations of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*.; and (c)

violations under 42 USC § 1983  as to the deprivation (under color of law) of Jane's rights as granted by laws of the United States.

## II.    PARTIES

2.    Plaintiff **JANE HUMBLE-ISD DOE** ("Jane") is an individual residing in the State of Texas, is a minor, and this matter is being asserted by her parents as her *Next Friends*.  Because of the privacy issues involved in this matter, Jane is hereby exercising her rights to proceed with this matter anonymously.

3.    The need to protect the identity of Jane (being a minor) does not hinder the defense of this matter by Defendant, for the facts are well known to the Defendant. When applying the applicable tests (created by the jurisprudence of the United States) to balance the needed protection of the minor vs. any inconvenience to the Defendant, the protection of the minor Jane prevails.  Further, with the importance of keeping the identity of Jane protected, it is impossible (at this time) to disclose the name of the parents of Jane.

4.    At such time as the Court might agree on procedures designed to protect the privacy of Jane and to ensure that Jane is protected from retaliation by Defendant, Jane's identity (and the identity of Jane's parents) shall be disclosed.

**PLAINTIFF'S FIRST-AMENDED COMPLAINT**

2

tpg 2018.06.20

5.    Defendant **HUMBLE INDEPENDENT SCHOOL DISTRICT** ("Humble-ISD") is a school district located in the State of Texas and has already made an appearance before this court.

## III.  JURISDICTION AND VENUE

6.    This Court has jurisdiction of this dispute as involving a *federal question* proceeding arising under (a) the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. ("IDEA"); violations of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*. ("Section 504"); and (c) 42 USC § 1983 ("§ 1983") as to the deprivation (under color of law) of Jane's rights created by laws of the United States.

7.    Venue is proper in the Southern District of Texas because the events forming the basis of  this suit occurred in this District, and Plaintiff resides in this District.

## IV.  FACTUAL ALLEGATIONS

8.    Plaintiff Jane is a minor and attended Atascocita High School ("Atascocita High"). Atascocita High is a high school owned and operated by Defendant AC-ISD.

**PLAINTIFF'S FIRST-AMENDED COMPLAINT**                                    3
tpg 2018.06.20

9.      Notwithstanding the lack of assistance given to Jane by Defendant Humble-ISD, Plaintiff Jane just graduated from Atascocita High and will soon be attending college.

10.     During the 2015-2016 school year at Atascocita High, Jane was an active and successful student. One of the many school functions Jane took part in was as a cheerleader for her fellow "EAGLES."

11.     On or about November 19, 2015, Jane and other members of her cheer squad were practicing various stunts. During one such stunt, Jane fell, hard to the ground, hit the back of her head, and suffered a concussion ("Concussion").

12.     No coach, sponsor, or adult associated with Atascocita High was watching the squad at the time that Jane suffered her Concussion.

13.     Upon arriving to pick up Jane from practice (the day she suffered her Concussion), Jane was found alone and unattended, sitting in the dark, crying in pain and filled with angst. No one from Atascocita High had called anyone in Jane's family to inform the family of the Concussion that Jane had suffered.

14.     When asked how Jane had suffered her Concussion, Jane's coach stated: "*We lost her*."

15.    As a direct result of suffering the Concussion, Jane attempted to take her own life in December 2015. Most fortunately, Jane did not succeed.

16.    In an action that violates all levels of Jane's rights of privacy and confidentiality, including but not being limited to such rights created by the Family Educational Rights and Privacy Act, Reginald Spivey (the principal of Atascocita High and an employee of Defendant Humble-ISD) sent a written communication to administrators at Atascocita High, stating: "*Jane tried to commit suicide.*" Needless to say, Jane was severely traumatized that some of her teachers at Atascocita High were told of her attempt to take her own life.

17.    At a later date, Plaintiff Jane was determined to have certain disabilities ("Disability") stemming from the Concussion.

18.    Jane was subsequently evaluated to determine what sort of accommodations would be required to offer Jane.

19.    Plaintiff Jane's return to Atascocita High was fraught with problems and roadblocks caused by Humble-ISD, including but not being limited to the following:

> (a)    Jane was instructed to practice and perform notwithstanding her Concussion, thereby putting Jane's life in harm's way;

**PLAINTIFF'S FIRST-AMENDED COMPLAINT**                                    5
tpg 2018.06.20

(b)  Cindy Marches (Jane's cheer coach and an employee of Defendant Humble-ISD) took steps to exclude Jane from various school functions and activities, not only in spite of, but because of, Jane's Disability;

(c)  Troy Kite (the athletic director at Atascocita High and an employee of Defendant Humble-ISD) refused to take any actions to protect Jane; and

(d)  Liliana Estes (a teacher at Atascocita High and an employee of Defendant Humble-ISD) refused to work with Jane not only in spite of, but because of, Jane's Disability.

20.  As of this filing, Plaintiff Jane now suffers, and will forever suffer, painful and often debilitating migraines stemming from the actions of Defendant Humble-ISD.

21.  As a public school district located in the State of Texas that receives certain funding from the United State of America under the IDEA, Defendant Humble-ISD is mandated to implement policies and procedures assuring that all students with potential disabilities are identified and evaluated ("Child Find") for services under the IDEA.

22.  However, after Plaintiff Jane suffered her Concussion, Defendant Humble-ISD made no effort to properly evaluate whether Jane was eligible was services under the IDEA or Section 504.

23.    Defendant Humble-ISD's failure to immediately implement Child Find efforts as to Plaintiff Jane created a scenario whereby Jane attempted to take her own life.  For the purposes hereof, the IDEA and Section 504 shall be collectively referred to as the "Laws Protecting Jane").

24.    The actions of Defendant Humble-ISD (as heretofore described shall hereafter be collectively referred to as "Defendant Humble-ISD's Actions") were committed (under color of law) in contravention of, and without regard for, the Laws Protecting Jane (hereafter collectively, the "Deprivation of Jane's Rights").

25.    Defendant Humble-ISD's Deprivation of Jane's Rights were  a violation of the Defendant's Child Find obligations, and were further taken in spite of, and as a direct result of, the Jane's Disability.

26.    As a direct result of the Deprivation of Jane's Rights, Jane's mental health has deteriorated and is likely to continue to deteriorate.

27.    Plaintiff Jane has also suffered severe physical, emotional, and economic harm as a result of the Deprivation of Jane's Rights and shall suffer future physical, emotional, and economic harm.

28.    Defendant Humble-ISD's Deprivation of Jane's Rights were committed intentionally and in bad faith.

**PLAINTIFF'S FIRST-AMENDED COMPLAINT**                    7

29.   Defendant Humble-ISD's Deprivation of Jane's Rights were (a) the direct result of the execution of official "customs" and/or "policies" ("Customs & Policies"); (b) approved or sanctioned by the Humble-ISD Board of Trustees or its designees; (c) executed (by the final policymakers (or designees) within Defendant Humble-ISD) with deliberate indifference towards the harm that would be inflicted upon Plaintiff Jane; and (d) the Customs & Policies were clearly the moving force behind the violations of Jane's rights under the Laws Protecting Jane. Were it not for the Customs & Policies of Defendant Humble-ISD, Jane would not have been harmed.

30.   The Child Find violation by Defendant Humble-ISD is a *per se* failure at the beginning, and, continued until Plaintiff Jane was properly evaluated. There are no administrative remedies that exist under the IDEA that can turn back the clock and allow the Defendant to be immune from its Child Find failures. Rather, the remedies available to Plaintiff Jane for the Child Find violations are monetary in nature and found under Section 504.

31.   Recently made public by the United States Department of Education is a decade long, coordinated effort by the Texas Education Agency ("TEA") and public school districts within the State of Texas to unlawfully suppress (a) the

number of students in Texas receiving assistance under Section 504 and the IDEA, and (b) the level of services under Section 504 and the IDEA.

32.    A complete copy of the January 11, 2018 Letter and Report is attached hereto as Exhibit "A" and is incorporated herein by reference for all purposes (hereafter, "DE Report").

33.    According to the DE Report, the referenced repression began in 2004 and continued unabated through 2016 (hereafter, the "TEA and Districts' Suppression Efforts").

34.    Defendant Humble-ISD's Deprivation of Jane's Rights occurred within the time period of the TEA and Districts' Suppression Efforts.

35.    Without discovery efforts through this proceeding, Plaintiff Jane has no means whatsoever to definitively determine whether (a) Defendant Humble-ISD took part in the TEA and Districts' Suppression Efforts; (b) how entailed such Suppression Efforts might have been, and (c) whether Jane was a victim of such Suppression Efforts.

36.    As a result of Defendant Humble-ISD's Deprivation of Jane's Rights, Jane was forced to engage an attorney and pursue this action to redress such wrongs.

**PLAINTIFF'S FIRST-AMENDED COMPLAINT**                                                    9
tpg 2018.06.20

37.     All conditions precedent to Plaintiff Jane bringing these claims have been met.

## E.  PLAINTIFF'S CAUSES OF ACTION

38.     Plaintiff incorporates by reference the facts set forth in foregoing Article D: GENERAL BACKGROUND hereof.

### 1.  CHILD FIND VIOLATIONS

39.     Defendant Humble-ISD failed its Child Find duties under the IDEA.

40.     As a result of such violations, Plaintiff Jane has been harmed, and will continue to suffer harm.

41.     Plaintiff now seeks all actual and consequential damages available to Plaintiff for same.

### 2.  VIOLATIONS OF SECTION 504

42.     Defendant Humble-ISD's Actions (including its Child Find violations) are violations of the rights granted Plaintiff Jane under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*.

43.     As a result of such violations, Plaintiff Jane has been harmed, and will continue to suffer harm.

44.     Plaintiff now seeks all actual and consequential damages available to Plaintiff for same.

### 3.  DEPRIVATION OF RIGHTS-§1983 ACTION

45.    Section 1983 of Title 42 of the United States Code provides, in part:

> "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, and citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the part injured in an action at law, suit in equity, or other proper proceeding for redress…"

46.    Defendant Humble-ISD's Actions are violations of Plaintiff Jane's rights under the IDEA and Section 504 (being laws of the United States), committed under the color of law.

47.    Plaintiff Jane has been harmed by such violations committed by Defendant Humble-ISD.

48.    Plaintiff now seeks all actual and consequential damages available to Plaintiff for same in accord with 42 USC §§ 1983 as to the deprivation (under color of law).

### 4.  EXEMPLARY DAMAGES

49.    The actions taken by Defendant Humble-ISD were intentional and maliciously executed against Plaintiff Jane. As such, Defendant Humble-ISD is liable for exemplary damages.

**PLAINTIFF'S FIRST-AMENDED COMPLAINT**                                          11

tpg 2018.06.20

### 5. <u>PRE and POST JUDGMENT INTEREST</u>

50.  Plaintiff also requests pre and post judgment interest as may be allowed by applicable law.

### 6. <u>ATTORNEYS' FEES</u>

51.  Plaintiff Jane should be awarded her reasonable and necessary attorneys' fees incurred in relation to the foregoing as allowed by applicable law.

### F.  <u>REQUEST FOR JURY</u>

52.  Plaintiff Jane has previously exercised her right to demand that a jury be empaneled, and, that the foregoing causes of actions and requests for relief be presented to such jury for resolution.

### G.  <u>CONCLUSION</u>

WHEREFORE, Plaintiff JANE HUMBLE-ISD DOE prays that upon final trial hereof, that judgment be entered in favor of Plaintiff Jane for the actual, consequential, and exemplary damages set forth herein including pre and post judgment interest; that Plaintiff Jane be reimbursed her reasonable and necessary attorneys' fees required to bring this matter; that all costs of Court be taxed against Defendant; and that Plaintiff Jane have such further and other relief, general and special, both at law or in equity, to which she may show herself to be justly entitled.

Respectfully submitted,

Henslee & Gorman, PLLC

By: _____

Terry P Gorman, Esq.
Texas Bar No. 08218200
tgorman@school-law.co
901 Mopac Expressway South, Suite 300
Austin, Texas 78746
Telephone: (972) 235-4700 (tpg Direct)
Telecopier: (512) 597-1455
**COUNSEL FOR PLAINTIFF**
**JANE HUMBLE-ISD DOE**

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of June 2018, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to the following:

Clay T. Grover
Rogers, Morris & Grover, L.L.P.
5718 Westheimer, Suite 1200
Houston, Texas 77057
*(Via CM/ECF notification)*

_____
Terry P Gorman, Esq.

**PLAINTIFF'S FIRST-AMENDED COMPLAINT**                                         13
tpg 2018.06.20

**EXHIBIT 'A'**
**to**
**PLAINTIFF'S FIRST-AMENDED COMPLAINT**

UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

**January 11, 2018**

Honorable Mike Morath
Commissioner
Texas Education Agency
1701 N. Congress Ave.
Austin, Texas 78701

Dear Commissioner Morath:

This letter is to provide you with a summary of the results of the Office of Special Education Program's (OSEP) monitoring visit in Texas during the week of February 27, 2017. The visit was prompted by reports about the declining identification rate in Texas of children with disabilities under the Individuals with Disabilities Education Act (IDEA). As data from the Texas Education Agency (TEA) demonstrates, the number of children identified as children with disabilities under the IDEA significantly declined from the 2003-2004 to 2016-2017 school years from 509,401 to 477,281 students. While this represents a decrease of over 32,000 students, this decline is noteworthy given that during those same years, the total enrollment in Texas schools grew from 4,328,028 to 5,359,127 – an increase of 1,031,099 students.[1] Additionally, during this time period, Texas implemented a special education representation indicator in its Performance-Based Monitoring and Analysis System (PBMAS) to measure the percentage of students enrolled in special education and related services in an Independent School District (ISD) against a standard of 8.5 percent (8.5 percent indicator). Consequently, OSEP was interested in determining the extent to which the 8.5 percent indicator contributed to, or influenced, the identification and evaluation of children with disabilities under the IDEA.

Section 616 of the IDEA requires the U.S. Department of Education (Department) to monitor States with a focus on: (1) improving educational results and functional outcomes for all children with disabilities; and (2) ensuring that States meet the program requirements, particularly those most closely related to improving educational results for children with disabilities. One of these requirements is child find, described below.

The results of this monitoring visit were based on the following information:

- TEA's November 2, 2016 response to OSEP's October 3, 2016 letter regarding OSEP's concerns with Texas's PBMAS 8.5 percent Indicator; [2]

---

[1] This information is provided through TEA's enrollment trend reports, available at:
http://tea.texas.gov/acctres/Enroll_2003-04.pdf and http://tea.texas.gov/acctres/enroll_2016-17.pdf.
[2] Both letters are available on the Office of Special Education and Rehabilitative Services' (OSERS) website:
https://www2.ed.gov/about/offices/list/osers/events/2016/texas-listening-sessions/index.html.

400 MARYLAND AVE. SW, WASHINGTON, DC 20202

www.ed.gov

The Department of Education's mission is to promote student achievement and preparation for global competitiveness by
fostering educational excellence and ensuring equal access.

06/20/2018
15 of 33

Page 2 – Honorable Mike Morath

- Feedback from parents of children with disabilities and other interested parties at five listening sessions held throughout Texas in December 2016;

- Review of over 400 individual comments received through a blog on the Department's website established to provide an opportunity for members of the public to comment on the issue;[3]

- Review of State- and district-level documents related to the identification and evaluation of students with disabilities, and policies and procedures regarding Response to Intervention (RTI), provision of related aids and services under Section 504 of the Rehabilitation Act of 1973 (Section 504), and the Texas Dyslexia Program;

- OSEP's visits to twelve ISDs to collect district-level and school-level data and to interview teachers, administrators, and ISD staff on referral, child find, and evaluation practices and procedures[4]; and

- Interviews with representatives from TEA to discuss TEA's oversight of district special education programs, specifically issues regarding referral, child find, and evaluation of children suspected of having disabilities.

Additional Background Regarding Monitoring Visit

On October 3, 2016, in response to concerns highlighted in an investigative report on special education published in the September 11, 2016 edition of the *Houston Chronicle,* OSEP wrote to TEA to request information regarding the steps the State had taken and would continue to take to address the allegation that the use of the 8.5 percent indicator resulted in a failure to identify and evaluate all children in Texas suspected of having a disability under the IDEA. We acknowledge that TEA took steps to address some of the initial issues we outlined in our letter, including informing each ISD in the State that it may not violate the rights of children with disabilities by delaying or denying referrals, evaluations, or the provision of special education and related services and announcing that the 8.5 percent indicator would not be used for intervention staging in future years. However, following TEA's November 2, 2016 response, OSEP determined there was a need to conduct listening sessions across the State to provide parents and other members of the public the opportunity to share concerns related to the 8.5 percent indicator.

We appreciated that TEA agreed to coordinate a series of evening listening sessions during the week of December 12, 2016.[5] Both OSEP and TEA staff attended the sessions held in five locations throughout the State: Dallas, Houston, El Paso, Edinburg, and Austin. Additionally, OSEP created a blog that was open for comment from December 5, 2016 through January 6, 2017. The listening sessions and the blog attracted significant interest, with hundreds of community members attending the listening sessions and 423 individuals providing comments on the blog.

---

[3] The OSEP blog is currently available on OSERS' website: https://sites.ed.gov/osers/2016/11/texas-listening-sessions/.

[4] During the week of the on-site visit, OSEP visited Aldine ISD, Austin ISD, Ector County ISD, Everman ISD, Del Valle ISD, Ft. Bend ISD, Harlandale ISD, Houston ISD, Laredo ISD, Leander ISD, North East ISD, and United ISD.

[5] In each of the five locations, OSEP also held afternoon meetings with ISD staff to provide an opportunity for staff to comment on the impact of the 8.5 percent indicator on special education identification rates in their districts.

Page 3 – Honorable Mike Morath

Comments received during the listening sessions and through the blog raised questions about the State's compliance with the child find requirements in section 612(a)(3) of the IDEA to identify, locate, and evaluate children with disabilities who need special education and related services and the requirement in section 612(a)(1) of the IDEA, to make available a free appropriate public education (FAPE) to all eligible children with disabilities residing in the State. Through the listening sessions and the blog, parents described in great detail the steps they had taken to obtain services for their children who were struggling to learn in the general education environment. A fuller description and analysis of comments provided by parents is found in the Enclosure to this letter. Among the numerous issues identified through public comments, a number of parents described how their children were unsuccessfully provided interventions through RTI programs for years before finally being referred for an initial evaluation for special education and related services under the IDEA. Some parents explained that their children were provided related aids and services under Section 504, but continued to encounter educational difficulties. Multiple parents commented that they were informed by school officials that their children's diagnoses of dyslexia indicated that the dyslexia was not "severe enough" to warrant an evaluation for special education and related services under the IDEA.

Due to the volume of the comments provided by parents, teachers, and other members of the public, OSEP decided to return to Texas to conduct site visits in select ISDs. OSEP provided TEA with additional details about this visit in a January 19, 2017 letter. We appreciated TEA's prompt attention to providing documentation from twelve ISDs in advance of the visit, coordinating the logistics for the visits across the State, and for attending each of the visits alongside OSEP staff. We also appreciated the opportunity to meet with TEA staff on March 3, 2017 to gain additional information about State-level policies, procedures, and practices.

Ten OSEP staff members conducted the onsite visits and were accompanied by a TEA staff member during each visit. OSEP staff generally visited two schools at each ISD. At each school, OSEP conducted interviews with two teams of teachers and a team of administrators. OSEP also conducted an interview with district administrators in each ISD. OSEP communicated to school and district staff that the intent of the visit was to gather additional information about the decline in the State's identification rate for children with disabilities, explaining that the interview would include questions about child find procedures, as well as questions about other programs and services offered in the school and/or district to serve students in need of additional support such as RTI, related aids and services under Section 504, and the State's dyslexia program. Although these interviews occurred at school and district levels, OSEP clarified that the purpose of the visit was to ensure that the State carried out its general supervisory responsibility under the IDEA by ensuring that ISDs properly implement requirements under the IDEA. Therefore, OSEP noted that findings would not be issued with respect to specific schools or ISDs but rather, the visit would result in the issuance of a report to TEA identifying any statewide areas of concern.

Summary of Findings of Noncompliance

A full description of OSEP's monitoring and analysis is found in the Enclosure to this letter. Of particular note, OSEP determined that some ISDs took actions specifically designed to decrease the percentage of students identified for special education and related services to 8.5 percent or below, even though there was no evidence to indicate that students were improperly referred and found eligible for special education and related services. Consequently, TEA's use of the 8.5 percent indicator did result in a decline in the State's overall special education identification rate

Page 4 – Honorable Mike Morath

from 11.6 percent in 2004 to 8.6 percent in 2016.[6]  Through evidence collected during the monitoring visit, OSEP staff also identified many situations where ISDs engaged in practices that violated the IDEA's child find requirements, particularly in situations in which ISDs provided supports to struggling learners in the general education environment through mechanisms including RTI, Section 504, and the State dyslexia program, even though the students were suspected of having disabilities and needing special education and related services under the IDEA.  As such, OSEP's monitoring demonstrated that TEA did not ensure that all ISDs in the State properly identified, located, and evaluated all children with disabilities residing in the State who were in need of special education and related services, as required by 34 CFR §300.111, and consequently, failed to make FAPE available to all eligible children with disabilities residing in the State, as required by 34 CFR §300.101.

OSEP's specific findings of noncompliance include the following:

1.  TEA failed to ensure that all children with disabilities residing in the State who are in need of special education and related services were identified, located, and evaluated, regardless of the severity of their disability, as required by IDEA section 612(a)(3) and its implementing regulation at 34 CFR §300.111.
2.  TEA failed to ensure that FAPE was made available to all children with disabilities residing in the State in Texas's mandated age ranges (ages 3 through 21), as required by IDEA section 612(a)(1) and its implementing regulation at 34 CFR §300.101.
3.  TEA failed to fulfill its general supervisory and monitoring responsibilities as required by IDEA sections 612(a)(11) and 616(a)(1)(C), and their implementing regulations at 34 CFR §§300.149 and 300.600, along with 20 U.S.C. 1232d(b)(3)(A), to ensure that ISDs throughout the State properly implemented the IDEA child find and FAPE requirements.

OSEP appreciates the cooperation and assistance provided by your State staff and others, including staff from the regional Education Service Centers that hosted the December 2016 listening sessions, and the teachers and district staff who participated in onsite interviews, as well as the hundreds of parents of children and youth with disabilities and members of the public who offered feedback and input on the State's systems for providing special education and related services to eligible children with disabilities under the IDEA.  We also acknowledge that the State is still working to recover from the impact of Hurricane Harvey and that many staff resources at TEA are dedicated to recovery efforts.  Because we acknowledge additional time may be needed to address some of the corrective actions and next steps outlined in the attached Enclosure, OSEP will work with TEA upon issuance of this letter to establish an agreeable timeline by which TEA will provide OSEP with a plan for corrective action.

---

[6] See data reported in the 2006 and 2016 PBMAS State Reports, available at http://tea.texas.gov/pbm/stateReports.aspx.

Page 5 – Honorable Mike Morath


We look forward to actively working with the State to improve results for Texas' children and youth with disabilities and their families.  If you have any questions or wish to request technical assistance, please do not hesitate to call your OSEP State Lead, Leslie Clithero, at 202-245-6754.

<div style="margin-left:40%">

Sincerely,


/s/
Ruth E. Ryder
Acting Director
Office of Special Education Programs

</div>

Enclosure

cc:
      Justin Porter, Executive Director for Special Populations
      Tammy Pearcy, Assistant Director for Special Education

**Texas Part B 2017 Monitoring Visit Letter**

**Enclosure**

This Enclosure describes the results of the Office of Special Education Programs' (OSEP) monitoring visit to the Texas Education Agency (TEA) and twelve Independent School Districts (ISDs) in Texas during the week of February 27, 2017.[1] This Enclosure provides OSEP's analysis of factors related to the declining identification rate, and addresses the effect of TEA's 8.5 percent special education representation indicator (known as the 8.5% indicator in its Performance Based Monitoring Analysis System (PBMAS)) on the declining identification rate, as evidenced through ISD-level data that documents the number of children identified as children with disabilities eligible for special education and related services under the Individuals with Disabilities Education Act (IDEA).

As a result of the monitoring visit, OSEP determined that some ISDs took actions specifically designed to decrease the percentage of children identified as children with disabilities under the IDEA to 8.5 percent or below. Consequently, TEA's use of the 8.5 percent indicator resulted in a decline in the State's overall special education identification rate from 11.6 percent in 2004 to 8.6 percent in 2016. OSEP acknowledges that Texas has taken steps to address this issue. Notably, on May 22, 2017, Governor Abbott signed a new State law amending the State's education code to prohibit the use of a performance indicator that solely measures the performance of ISDs based on the total number or percentage of enrolled children receiving special education and related services under the IDEA.[2]

However, through evidence collected during monitoring interviews, OSEP also identified many situations where ISDs engaged in practices that violated the IDEA child find requirements. While the U.S. Department of Education (Department) encourages the use of supports for struggling learners that can be delivered in the general education environment, TEA and ISDs within the State have an obligation under the IDEA to ensure that evaluations of children suspected of having a disability are not delayed or denied because of implementation of such supports. OSEP found evidence demonstrating a pattern of practices in ISDs throughout the State in which evaluations were delayed or not conducted for children who were suspected of having a disability because these children were receiving supports for struggling learners in the general education environment.

Due to this pattern, OSEP finds that TEA did not ensure that all ISDs in the State properly identified, located, and evaluated all children with disabilities residing in the State who were in need of special education and related services, as required by 34 CFR §300.111. Consequently, TEA failed to make a free appropriate public education (FAPE) available to all eligible children with disabilities residing in the State, as required by 34 CFR §300.101. This Enclosure concludes with OSEP's three findings of noncompliance and associated required corrective actions.

---

[1] The IDEA uses the term "local educational agency" (LEA), as defined in 20 U.S.C. §1401(19), to refer to school districts. However, in Texas an LEA is commonly referred to as an "independent school district" (ISD). This Enclosure uses the term "ISD" to refer to entities that also meet the IDEA's definition of LEA. During the monitoring visit, OSEP visited Aldine ISD, Austin ISD, Ector County ISD, Everman ISD, Del Valle ISD, Ft. Bend ISD, Harlandale ISD, Houston ISD, Laredo ISD, Leander ISD, North East ISD, and United ISD.

[2] Texas Senate Bill 160 (effective May 22, 2017):
http://www.legis.state.tx.us/tlodocs/85R/billtext/html/SB00160F.htm

Page 2 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

## I.      Background Information and OSEP's Analysis of TEA's 8.5 Percent Indicator

TEA's Special Education Representation Indicator Set Identification Rate Targets for Children with Disabilities at 8.5 Percent in TEA's PBMAS

TEA's PBMAS is an automated data system that reports annually on the performance of ISDs in selected program areas.[3] TEA has used the PBMAS since 2004. TEA's system for monitoring ISDs based on the PBMAS has undergone revisions since 2004. However, since its inception, based on the results of this system, TEA has assigned each ISD to a "stage" (or level) of intervention, and has informed the ISD of any required actions. Through the PBMAS, TEA assigns a performance level (PL) for each indicator to reflect the ISD's performance relative to the State's established standard.

Since its inception in 2004, the PBMAS has included a special education representation indicator to measure the percentage of enrolled children who receive special education and related services under the IDEA. TEA first assigned a PL for this indicator in 2005. TEA assigns a higher PL to an ISD when the percentage of children with disabilities exceeds 8.5 percent of the total enrolled population (hereafter, "8.5 percent indicator").[4] The PL for each indicator within the PBMAS has its own established cut points, but generally "the higher the PL is, the lower the district's performance is."[5]

For example, in 2016, the 8.5 percent indicator measuring special education representation was Indicator 10. A PL of "0" was assigned to each ISD that reported 0-8.5 percent of children in the ISD identified as children with disabilities and receiving special education and related services under the IDEA; PL "1" was assigned to each ISD that reported 8.6-11 percent; PL "2" was assigned to each ISD that reported 11.1-15 percent; and PL "3" was assigned to each ISD that reported 15.1 percent or above.[6] TEA noted in its November 2, 2016 response to OSEP that while the PBMAS special education representation rate indicator includes four ranges, only one of those ranges (PL 3, 15.1 percent and above) was ever used by TEA as a sole determinant for an ISD's intervention staging. TEA also noted, however, that an ISD with special education representation rates in the 11.1-15.0 percent range (PL 2) "may be considered for intervention staging, but only if its performance on other PBMAS special education indicators indicates a high degree of concern." OSEP reviewed TEA's PBMAS system, including its special education indicators, as part of prior monitoring visits in 2006 and 2011. In this most recent monitoring visit, however, OSEP examined the special education representation indicator's association with the reduction in the rate of children identified as children with disabilities under the IDEA. OSEP found through its review of documents and information obtained through interviews with ISD staff, including teachers and school administrators, that some ISDs took actions specifically designed to decrease the identification of children for special education and related services under the IDEA when TEA indicated that the ISD's rate exceeded 8.5 percent. By taking such actions, staff in certain ISDs indicated that there was an expectation that the ISD would receive less monitoring, at least on this

---

[3] For an overview of TEA's PBMAS, see the PBMAS Manual available here: http://tea.texas.gov/Student_Testing_and_Accountability/PBMAS/.
[4] In TEA's 2016 PBMAS manual, Indicator 10 measures special education representation. For additional detail, see page 64 of the manual.
[5] 2016 PBMAS Manual, page 10.
[6] 2016 PBMAS Manual, page 64.

Page 3 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

particular indicator, from TEA. Consequently, OSEP concludes that TEA's use of the 8.5 percent indicator resulted in a decline in the State's overall special education identification rate from 11.6 percent in 2004 to 8.6 percent in 2016.[7] Thus, TEA's use of the 8.5 percent indicator contributed to a statewide pattern of practices that demonstrate that TEA did not ensure that all ISDs in the State properly identified, located, and evaluated all children with disabilities who were in need of special education and related services, as required by 34 CFR §300.111, and consequently, failed to make FAPE available to all eligible children with disabilities residing in the State, as required by 34 CFR §300.101.

<u>Actions Taken by ISDs to Reduce the Special Education Identification Rate</u>

Through document review and the monitoring visit, OSEP staff examined ISD-level improvement planning documents and interviewed ISD staff. OSEP learned that ISDs often analyzed trend data based on the 8.5 percent indicator and, in some cases, included specific actions that the ISD would take to decrease the percentage of children in the ISD identified as eligible for special education and related services under the IDEA. This raised questions because in these ISDs OSEP did not find evidence to indicate that struggling learners had either been inappropriately referred or found eligible for special education and related services. Reductions in the percentage of children found eligible to receive special education and related services would not violate the IDEA if every child suspected of having a disability was properly identified, located, and evaluated in accordance with 34 CFR §300.111. However, noncompliance with the IDEA child find and FAPE requirements occurred to the extent that ISD efforts to decrease the percentage of children who were eligible for special education and related services under the IDEA caused delays or denials of evaluations for special education and related services for children who were suspected of having a disability and needing special education and related services. As explained more fully below, these actions demonstrate that TEA's use of the 8.5 percent indicator operated as an incentive for ISDs to not properly implement the IDEA's child find requirement, and therefore resulted in actions that violated those requirements. The following examples illustrate ISD actions to reduce the percentage of children identified for special education and related services.

- One ISD's 2004–05 and 2005–06 "PBMAS Sped Continuous Improvement Plan" included that the ISD planned to reduce the percentage of children receiving special education services. Its "Measurable Evidence of Change" indicated that district data would reflect a decrease in the percentage of children receiving special education services. Among other strategies, the ISD's plan stated that it would create this change through the use of differentiated instruction, related aids and services in accordance with Section 504, and central office review of all requests to initiate referrals for special education evaluation. Additionally, the ISD's 2006–07 Continuous Improvement Plan stated that the ISD planned to "reduce the percentage of children receiving special education services" and would provide evidence of the change through district data that would reflect a decrease in the percentage of children receiving special education services. Further, the ISD's 2011–12 District Improvement Plan explained that it would "continue developing and implementing a new Child Study System" and that the evidence of impact would be "fewer referrals for special education evaluation and decreased SPED representation." In this plan, the ISD reported it would "contract with specialists to review and make

---

[7] See data reported in the 2006 and 2016 PBMAS State Reports, available at
http://tea.texas.gov/pbm/stateReports.aspx.

Page 4 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

recommendations for evaluation reports of students identified with emotional disturbance, other health impairment, intellectual disability and autism" and "(e)xpand evaluation staff peer review using above recommendations." The 2011–12 District Improvement Plan specified that the ultimate goal of these activities was "decreased SPED representation." In a data review, OSEP staff found that this ISD's special education identification dropped from 12.5 percent in 2005 to a low of 9.8 percent in 2012.[8]

- In another ISD, the superintendent reported in an interview with OSEP staff that he takes steps to reduce special education identification, explaining that he uses data to monitor the number of children in special education and then he "leans on the administrators" if the numbers are too high because the school board "leans on him." A TEA program monitoring report from 2006–07 also acknowledged that this ISD took actions to reduce the number of children identified for special education, and stated "…the LEA is taking action to reduce the number of students being referred for special education services and ultimately reduce the number of students who require special education services." Furthermore, in a data review, OSEP staff found that the percentage of children enrolled in special education and related services in this ISD dropped from 12.5 percent in 2005 to 7.8 percent in 2016.

- In the 2009–10 school year, another ISD's corrective action plan (CAP), created and implemented because the ISD exceeded the 8.5 percent identification rate, indicated that the ISD would "decrease the percentage of enrolled students receiving SPED (special education) services in order to meet the state average" and specifically included that it would work towards decreasing the "special education population" by 4 to 6 percent. OSEP staff determined through a data review that the percentage of children identified for special education in this ISD dropped from 15.3 percent in 2005 to 12.2 percent in 2016. However, the ISD's data dropped more significantly in the years directly after the CAP. For instance, the rate was 11.7 percent in 2010, 10.6 percent in 2011, and 10 percent in both 2012 and 2013 before beginning to increase to the 2016 rate.

II.     **TEA's Failure to Ensure That ISDs Properly Implement the IDEA Child Find Requirements**

Under 20 U.S.C. 1412(a)(3) and 34 CFR §300.111, as a condition of receiving assistance under Part B of the IDEA, each State must have in effect policies and procedures to ensure that (i) all children with disabilities in the State, including children with disabilities who are homeless or wards of the State, and children with disabilities attending private schools, regardless of the severity of their disability, who are in need of special education and related services, are identified, located, and evaluated; and (ii) a practical method is developed and implemented to determine which children are currently receiving needed special education and related services. Under 34 CFR §300.8, a child must meet a two-prong test to meet the IDEA definition of "child with a disability": (1) have one of the specified impairments (disabilities); and (2) because of the impairment, need special education and related services. The IDEA does not limit or restrict the number of children who can be identified as "children with disabilities," provided that the child meets the IDEA's definition of "child with a disability." Further, States must have in effect policies and procedures to ensure that FAPE is made available to all children with disabilities residing in the State in the State's mandated age range, which in Texas is ages 3 through 21.

---

[8] 2016 data demonstrate that this ISD's percentage has increased to 10 percent.

Page 5 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

20 U.S.C. 1412(a)(1) and 34 CFR §300.101.  FAPE, among other things, includes the provision of special education and related services at no cost to parents in conformity with an individualized education program (IEP) that meets applicable IDEA requirements.  34 CFR §300.17.  Local educational agencies (LEAs), in providing for the education of children with disabilities within their jurisdiction, must have policies, procedures, and programs in effect that are consistent with the State's policies and procedures as a condition of receiving a subgrant of IDEA funds from the State.  34 CFR §§300.200 through 300.201.

Under the IDEA, the State must have a general supervision system that ensures that noncompliance with IDEA requirements is identified and corrected in a timely manner.  Section 612(a)(11) of the IDEA and 34 CFR §300.149 require States to ensure that the requirements of Part B of the IDEA are carried out and that each educational program for children with disabilities administered within the State is under the general supervision of individuals responsible for educational programs for children with disabilities in the State educational agency (SEA) and meets the educational standards of the SEA, including the requirements of Part B of the IDEA.  Section 616(a)(1)(C) of the IDEA and 34 CFR §300.600 require States to monitor implementation of Part B by LEAs.  The State must have in effect policies and procedures to ensure that it complies with the monitoring and enforcement requirements in 34 CFR §§300.149, 300.600 through 300.602 and 300.606 through 300.608.  20 U.S.C. 1232d(b)(3)(A).  In exercising its monitoring responsibilities, the State must ensure that when it identifies noncompliance with requirements of Part B by LEAs, the noncompliance is corrected as soon as possible, and in no case later than one year after the State's identification of the noncompliance.  34 CFR §300.600(e) and 20 U.S.C. 1232d(b)(3)(E).  Information that OSEP gathered through the monitoring visit, listening sessions, and comments to the OSEP blog demonstrates that TEA did not ensure that all ISDs in the State properly identified, located, and evaluated all children with disabilities residing in the State who were suspected of having a disability and being in need of special education and related services, as required by 34 CFR §300.111.  Because of TEA's failure to exercise its general supervisory responsibility to identify and correct noncompliance related to ISDs' implementation of child find requirements, the State is also unable to ensure that FAPE has been made available to all eligible children with disabilities residing in the State in accordance with 34 CFR §300.101.

  A.  Implementation of Response to Intervention (RTI) and Special Education Referral
      Procedures

  Background

TEA and ISDs within Texas must ensure that the use of an RTI strategy does not result in the delay or denial of evaluations for children suspected of having a disability who need special education and related services.[9]  The IDEA regulations in 34 CFR §300.307 require States to allow, as part of their criteria for determining whether a child has a specific learning disability (SLD), the use of a process based on the child's response to scientific, research-based intervention.  Although the regulations specifically address the use of RTI for determining if a child has an SLD, information obtained through RTI strategies may also be used as a component of evaluations for children suspected of having other disabilities, if appropriate.  However, RTI is only one

---

[9] See Memorandum to State Directors of Special Educ., https://sites.ed.gov/idea/idea-files/osep-memo-11-07-response-to-intervention-rti-memo/ (OSEP Memorandum 11-07, 01-21-11).

Page 6 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

component of an individual evaluation under the IDEA, and does not replace the need for a comprehensive evaluation of a child whom the LEA suspects has a disability and needs special education and related services.  34 CFR §300.304(b).

Under 34 CFR §300.301(b), consistent with applicable parent consent requirements in 34 CFR §300.300(a), a parent or LEA may request an initial evaluation to determine if the child is a child with a disability.  Under 34 CFR §300.309(c)(1), the LEA must promptly request parental consent to evaluate a child for special education and related services, if, prior to a referral, the child has not made adequate progress after an appropriate period of time when provided with RTI, and whenever a child is referred for an evaluation.  In accordance with 34 CFR §§300.309(c) and 300.311(a)(7), at any time during the RTI process, a parent may request an initial evaluation for the purpose of determining a child's eligibility for special education and related services.  If, however, the LEA does not suspect the child has a disability, and denies the request for an evaluation, the LEA must provide written notice to the parents explaining, among other things, why the public agency is refusing to conduct an initial evaluation, the information that was used as the basis for this decision, and that parents have protection under the procedural safeguards.  34 CFR §300.503(a) and (b).

OSEP reviewed written guidance that TEA provides to its ISDs on the use of RTI and the process for referring a child for special education under the IDEA, which OSEP determined to be consistent with the IDEA.  For example, the April 2016 version of TEA's document, *The Parents Guide to the Admission, Review, and Dismissal Process*, which is provided to parents prior to an initial admission, review, and dismissal (ARD) meeting (the first meeting of an IEP Team to discuss a child's need for special education under the IDEA), provides clarity on special education services in the State.[10]  This document also provides background information about RTI, explaining:

> "A child does not need to advance through each tier of the RTI system before a referral for special education is made. Once it is apparent that general education interventions are not sufficient, school personnel should suspect that the child has a disability and should initiate a referral. Parents can also request a referral at any time regardless of whether the child is receiving interventions through an RTI system."

Additionally, TEA's website contains a page dedicated to RTI which provides additional links to resources.[11]  This page similarly notes:

> "Students who may have a disability should be referred for a full and individual evaluation for special education services. States and LEAs have an obligation and requirement under federal law (34 CFR §300.111 Child Find) to see that evaluations of children suspected of having a disability are not delayed or denied because of schools using an RTI strategy."

Implementation of RTI in Texas

OSEP asked targeted questions to district and school staff about the implementation of RTI during the monitoring visit because of the volume and severity of the allegations parents raised through the December 2016 listening sessions and the OSEP blog.  Across the State, parents described

---

[10] See https://framework.esc18.net/Documents/ARD_Guide_ENG.pdf (available in English and Spanish).
[11] See http://tea.texas.gov/index2.aspx?id=2147500224.

Page 7 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

processes by which the implementation of RTI either delayed or denied their children from receiving timely evaluations for special education and related services under the IDEA. For example, one parent wrote about district employees having been instructed to continue RTI for years prior to referring a student suspected of having a disability for an initial special education evaluation. Another parent described a situation in which the family moved from another State into Texas and provided former evaluation data, yet the referral for an initial evaluation in Texas was delayed for three and a half years so that the child could receive ten minutes of RTI intervention each day. The same parent noted that once the child was evaluated for special education and related services under the IDEA, the child was found to be eligible.

Through document review, listening sessions, and interviews during the monitoring visit, OSEP found that, consistent with IDEA requirements, when a teacher suspected that a child needed additional academic support to succeed in the general education classroom, the teacher would generally first use RTI to provide tiered levels of intervention as part of general education instruction before referring the child for evaluation under the IDEA. However, the information OSEP collected and analyzed also revealed a general understanding among teachers and parents in Texas that completing all tiers of RTI was required prior to a referral for special education, particularly for children with SLD, but this practice cannot be used to delay or deny a timely evaluation of a child who is suspected of having a disability and in need of special education and related services. Allowing a child who is not making adequate progress to remain in RTI for an unreasonable or excessive amount of time, if the LEA suspects the child has a disability and needs special education and related services, is inconsistent with the IDEA child find requirements because it would result in an evaluation that is inappropriately delayed. 34 CFR §300.111.

Across the twelve ISDs that OSEP visited, teachers could not always define what level of progress would be sufficient for a child to stop receiving interventions provided through an elevated tier of RTI. In different schools within the same ISD and across different ISDs, staff expressed a lack of clarity as to which children enter tiers two or three, how long children are served in each tier, and when children move from one tier to the next within the RTI framework. School staff often explained that a child moves beyond tier one when the child does not meet the teacher's established academic benchmarks. Once the child receives services under tier two of RTI, some school staff noted that the child's progress is generally monitored against individual RTI goals. Teachers indicated that a child moves to an elevated tier of intervention (tier three, or in one instance, tier four) when the child is not making enough progress against such individual RTI goals. Through interviews, school staff explained that if a child demonstrates progress through RTI interventions, the child may either continue to receive RTI interventions, sometimes receiving a new intervention within the same tier, or return to general classroom instruction. While ISD's certainly have flexibility in implementing RTI, the lack of clarity in LEA- and school-level implementation contributed to the delay or denial in the identification and evaluation of children suspected of having disabilities and needing special education and related services.

School staff did point out during interviews that there are exceptional cases in which there are clear reasons to suspect that a child may have a disability and need special education and related services under the IDEA. In such cases, staff explained that the child would be referred for special education without first being provided RTI interventions. Generally, staff cited "visible disabilities" such as if a child struggles with speech, or enters the school with blindness or with a traumatic brain injury. In some cases, staff cited reasons to suspect that a child may have a

Page 8 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

disability and need special education and related services based on the child's classroom behavior that also led to a referral without first attempting RTI.

<u>Parent and Teacher Referrals for Special Education Evaluation During the RTI Process</u>

School and ISD staff interviewed during the monitoring visit indicated that during the RTI process, if a parent requests an initial evaluation to determine if the child is eligible for special education and related services, the school refers the child for an evaluation. However, this is inconsistent with information OSEP learned through parents in Texas, whose comments indicate they have encountered difficulty in obtaining an initial evaluation under the IDEA when their child was participating in the RTI process, even if they had contacted the school to request a referral for an initial evaluation. With regard to teacher referrals, interviews that OSEP conducted with school and ISD staff revealed that although the staff referral will be considered, the school may deny the initial evaluation if the child has not completed all tiers of the RTI process, even if there is reason to suspect the child has a disability. OSEP also identified instances in which staff members described suspecting that a child may have a disability and not making a referral for an evaluation under the IDEA, or delaying the referral, because the child was already receiving services through RTI.

B. <u>Section 504 Related Aids and Services</u>

Section 504 of the Rehabilitation Act of 1973 (Section 504) is the Federal law that prohibits discrimination on the basis of disability by recipients of Federal financial assistance. 29 U.S.C. 794 and 34 CFR Part 104. The Department's Office for Civil Rights (OCR) enforces Section 504 in elementary and secondary schools, and in postsecondary institutions, that receive Federal financial assistance. Section 504 regulations require a recipient that operates a public elementary or secondary education program or activity to provide FAPE to elementary and secondary school children with disabilities in its jurisdiction, regardless of the nature or severity of the student's disability. 34 CFR §104.33(a). FAPE under Section 504 includes the provision of regular or special education and related aids and services that are designed to meet the individual educational needs of children with disabilities as adequately as the needs of nondisabled children are met, and are based on adherence to procedures that satisfy requirements governing educational setting, evaluation and placement, and procedural safeguards. 34 CFR §§104.33-104.36. Implementation of an IEP developed in accordance with the IDEA is one means of meeting the Section 504 FAPE standard. 34 CFR §104.33(b)(2).

OSEP administers the IDEA, and has no enforcement responsibility for Section 504. OSEP is therefore not authorized to monitor the provision of Section 504 services in Texas. However, with regard to the IDEA, OSEP determined that some children in Texas who were suspected of having a disability and needing special education and related services under the IDEA were not referred for an evaluation under the IDEA, because they instead received services under Section 504.

One parent who wrote on the OSEP blog described a situation in which she received notification that her child was being served with tier two interventions through RTI, yet she believed more was needed and requested an evaluation for special education under the IDEA. The school informed her that the RTI process needed to continue and they would not evaluate, nor would the child advance to the next tier of RTI, since he was making progress in his current tier. The parent described a nine-month process in which she took her child for a medical evaluation and received

Page 9 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

a diagnosis of dyslexia and ADHD.  The child was eventually served through Section 504.  Noting that her child was still making slow progress, she explained she was promised a special education evaluation under the IDEA the next year, received one, and the child was identified to be in need of special education and related services under the IDEA.  This parent's story is just one example of the stories shared with OSEP about delays in trying to secure a special education evaluation when Section 504 related aids and services were already being provided.  Scenarios such as this led OSEP to ask questions during the monitoring visit about the implementation of Section 504 in relation to the IDEA.

In interviews with OSEP during the monitoring visit, school-based, district-level, and TEA staff explained that it was their understanding that because coverage under Section 504 has expanded, more children can now be considered to have a disability and receive services under Section 504 than in the past.[12]  Data demonstrate that a growing number of children with disabilities in Texas received related aids and services under Section 504 in order to access the general education curriculum.  According to estimates from the Department's Civil Rights Data Collection, 55,434 children in Texas received Section 504 related aids and services in 2004, and that number grew to 132,078 by the 2011–12 school year.[13]  This data, taken into consideration along with the evidence collected during the monitoring visit, raised concerns about the interaction between Section 504 and the IDEA, and the possibility that Section 504 related aids and services were used to delay or deny the identification and evaluation of children suspected of having a disability and needing special education and related services under the IDEA.

In interviews, school staff informed OSEP that there are situations where children with disabilities are not referred for an evaluation under the IDEA because the child is receiving related aids and services under Section 504, even though there may be reason to suspect that the child has a disability under the IDEA and needs special education and related services under that statute.  Through input from parents and groups in Texas, as well as interviews during the monitoring visit, OSEP staff learned that while a growing number of children with disabilities receive related aids and services under Section 504—even when a teacher suspects that one of these children has a disability and needs special education and related services under the IDEA—the child may not be referred for an initial evaluation under the IDEA in a timely manner if the child is receiving services under Section 504.  These practices create an unnecessary delay in the identification of children and in the provision of special education services under the IDEA.  In cases where a child receiving services under Section 504 is suspected of having a disability and needing special education and related services under IDEA, but is not referred at all for an IDEA evaluation, this also would constitute a denial of FAPE under the IDEA.

In at least one ISD, when a child was identified as a child with a disability who could be served under Section 504 or the IDEA, the child received an initial evaluation to determine whether services under the IDEA were needed in addition to the related aids and services made available to

---

[12] The Americans with Disabilities Act (ADA) Amendments Act of 2008, Pub. L. No. 110-325 (Amendments Act) amended 42 U.S.C. 12102 to clarify the definition of disability in the ADA and Section 504.  The Amendments Act explains that "The definition of disability in this chapter shall be construed in favor of broad coverage of individuals…" See 42 U.S.C. 12102(4)(A).  The Amendments Act also included a conforming amendment to the Rehabilitation Act of 1973 that affects the meaning of disability in Section 504.  See 29 U.S.C. 705(20)(B).  Children with disabilities may be served under both the IDEA and Section 504.

[13] Data compiled through the "State and National Estimations" tool, available at: http://ocrdata.ed.gov/StateNationalEstimations.

Page 10 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

the child under Section 504.  However, comments provided to OSEP with regard to general ISD practices throughout Texas indicated that this is not the general practice in the State.  Some school staff differentiated between Section 504 and the IDEA, indicating that if a child demonstrates a need for adapted academic goals or instructional programming, such a need would indicate a reason to suspect a disability, and that the child should be referred for an IDEA evaluation.  Teachers in one ISD, and district staff in another ISD, informed OSEP that, in some instances, a child suspected of having a disability and needing special education and related services can be served under Section 504 for about a year before a recommendation for an IDEA evaluation is considered.

Through monitoring visit interviews, OSEP learned that parents, teachers, and other school staff have an inconsistent understanding of when an evaluation under the IDEA may be warranted for a student served under Section 504.  While some teachers stated that such decisions are individualized based on the needs of each child, it was unclear what criteria teachers use to inform such decisions.  Information from parents collected during the listening sessions conducted prior to on-site monitoring also indicated parents' frustration with not understanding the differences between Section 504 and the IDEA.

C.  Implementation of State's Dyslexia Program

Dyslexia is a condition that could qualify a child as a child with a specific learning disability under the IDEA.  Under the IDEA and its implementing regulations, "specific learning disability" is defined, in part, as "a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia."  20 U.S.C. §1401(30) and 34 CFR §300.8(c)(10).  That is, where a child is identified with dyslexia and needs special education and related services under the IDEA, that child must be evaluated under the IDEA, subject to parental consent.  Moreover, regardless of whether a child has dyslexia or any other condition explicitly included in this definition of "specific learning disability," where the child is suspected to need special education and related services, the LEA must conduct an evaluation in accordance with 34 CFR §§300.304-300.311 to determine whether that child meets the criteria for specific learning disability or any of the other disabilities listed in 34 CFR §300.8.[14]

During the December 2016 listening sessions and on the OSEP blog, many situations were described in which individual students with dyslexia received services under Section 504 through the State's dyslexia program, rather than through special education and related services under the IDEA.  In some cases, this may have been appropriate.  It is certainly permissible to provide services to children with dyslexia under Section 504.  However, at times, parents described situations in which the parent believed that the student had a disability that required special education and related services, and requested an evaluation for services, yet the student was not referred for an evaluation under the IDEA.  Some situations were described in which dyslexia assessments didn't begin until a certain grade (for example, an ISD that didn't begin testing until second grade).  Statements such as these led OSEP to collect additional data through the

---

[14] See OSEP Dear Colleague Letter on Dyslexia (2015), available at:
https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/guidance-on-dyslexia-10-2015.pdf.

Page 11 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

monitoring visit to determine if some students with dyslexia may have had delayed evaluations or have been denied evaluations for special education and related services, even though school staff had suspected that the student may need special education and related services under the IDEA.

OSEP did not collect district-level data regarding the quality of services provided through the State dyslexia program, or data and information to determine whether the State dyslexia program provides special education and related services to individual children as defined by the IDEA. However, OSEP asked questions in interviews during the monitoring visit to determine whether there are some children who may be suspected of having a disability and needing special education and related services under the IDEA who may not receive such services because they are instead provided services under Section 504 through the State dyslexia program.

Through interviews during the monitoring visit, school and ISD staff explained to OSEP that dyslexia services in Texas are governed by the State's Dyslexia Handbook. OSEP's understanding of the Dyslexia Handbook—clarified through conversations with teachers and other staff across the State—is that a child must not only have difficulties related to reading (which would indicate a potential need for dyslexia services in Texas), but also must present a second, potentially disabling condition in order for school staff to refer the child for an evaluation under the IDEA. This practice violates IDEA child find requirements to the extent that there are students in Texas whose only disability is dyslexia, who are suspected to need special education and related services under the IDEA because of dyslexia, and yet are not referred for an evaluation for special education and related services.

TEA reported to OSEP through an interview during the monitoring visit that approximately 141,000 children in the State receive services for dyslexia, and that roughly 20 percent of those children are identified in the State's data system as receiving special education under the IDEA. Accordingly, roughly 80 percent of children with dyslexia receive services through Section 504. Through interviews with ISD staff during the monitoring visit and input from the OSEP blog and from parents through the listening sessions, OSEP also learned that practices for referring children with dyslexia for an initial evaluation for special education and related services under the IDEA are inconsistent across the State. For example, in one ISD, staff indicated that in cases where a child with dyslexia does not qualify for special education and related services under the IDEA, the ISD may provide the child with services through the State dyslexia program under Section 504. Yet in another ISD, a staff member indicated that a child can qualify for special education and related services under the IDEA for dyslexia only when there is another disability present. Staff in another ISD noted that a child can be dually identified as having dyslexia under Section 504 and the IDEA, and therefore could be served under both Section 504 and the IDEA, however the child would only receive services through the State's dyslexia program rather than any additional services through the IDEA.

ISD staff also expressed concerns about evaluation procedures for children with dyslexia. Consistent with policies established in the Dyslexia Handbook, staff in multiple ISDs indicated that initial evaluations for special education and related services under the IDEA are not conducted for children with dyslexia; rather, screenings are used to determine which children will benefit from the dyslexia program provided through Section 504. During one phone call with multiple stakeholders throughout the State, participants reported that one ISD has a common practice of initially evaluating children with dyslexia under both the IDEA and Section 504; however, upon hearing this statement, staff from other ISDs responded that this was not a common practice

Page 12 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

throughout the State and not the way that children were referred and evaluated within their respective ISDs.

Thus, the inconsistent interpretation and application of policies and procedures associated with referring a student with dyslexia for special education and related services at the ISD and school levels demonstrates that the State is not meeting its general supervisory responsibility to ensure that ISDs in the State are properly implementing the IDEA child find requirements in accordance with 34 CFR §§300.111 and 300.201. That is, if a student is identified with dyslexia, and needs special education and related services under the IDEA, a request for an IDEA evaluation must be initiated. To the extent that local practices have resulted in delays and/or denials of IDEA evaluations for students suspected of having dyslexia and needing special education and related services under the IDEA, the State has not ensured that its ISDs have made FAPE available to all eligible children with disabilities, as required by 34 CFR §§300.101 and 300.201.

D. Lack of Understanding of the Difference Between the IDEA and Programs for Struggling Learners

Given the confusion about the range of services for struggling learners, including RTI, OSEP's monitoring data revealed that, in many instances, children who should have been referred for an initial evaluation under the IDEA were instead provided other services for struggling learners for extended periods of time, even after there was continued reason to suspect that the student may have a disability and be in need of special education and related services. This resulted in either a delay or complete denial of these students' evaluations under the IDEA. It was not clear that teachers in some ISDs where OSEP conducted interviews understood the extent to which additional supports or services may be available and provided to an individual child through the provision of special education and related services under the IDEA, rather than through supports provided in RTI, related aids and services under Section 504, or other forms of specialized services provided outside of the IDEA. Generally, interview data indicated that staff in many schools and ISDs appeared to view special education under the IDEA as a "last resort," which should be avoided whenever possible to ensure that the child is instructed in a general education environment, even though children with disabilities can and do receive special education and related services in the general education environment.

Similar to teachers, parents who do not have adequate information about the array of services to support struggling learners are not always able to take the proper steps to request services for their children. Comments that OSEP received from parents indicated that parents did not have a clear understanding about the process for requesting an initial evaluation under the IDEA, as well as the differences in the services provided through RTI, Section 504, and the IDEA. In some cases, parents believed they were requesting an evaluation for special education under the IDEA, but instead were provided an evaluation of the child's progress with RTI interventions. The data OSEP collected reveal that such confusion resulted in delays in children being referred for an initial evaluation under the IDEA due to the fact that parents may have not always understood how to properly request a referral for special education and related services.

**Conclusion**

Through interviews with TEA officials and ISD and school staff, document reviews, listening sessions with parents, comments on an OSEP blog, and review of TEA's policies and procedures

Page 13 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

and guidance documents, OSEP has determined that TEA failed to ensure that its ISDs properly implemented IDEA child find requirements, and consequently, failed to make FAPE available to all eligible children with disabilities residing in the State, as required by the IDEA. This failure resulted in improper reductions, over a period of years, in the number of children identified as having disabilities and needing special education and related services under the IDEA.

The data OSEP collected indicate TEA's 8.5 percent special education representation indicator resulted in a decline in the State's overall special education identification rate. Although State law in Texas now prohibits the use of a special education representation indicator, OSEP also identified a number of practices statewide that contributed to the decline in the number of children with disabilities eligible for special education and related services under the IDEA. These practices demonstrate that TEA has failed to ensure that ISDs have properly implemented the IDEA child find requirements. These practices included using RTI strategies to delay or deny a timely evaluation for children suspected of having a disability and needing special education and related services; the increased use of Section 504 related aids and services as a means of providing struggling learners with additional services and supports, without referring children for an evaluation under the IDEA when those children were suspected of needing special education and related services under the IDEA; and the failure to refer students with dyslexia who are suspected of needing special education and related services for an evaluation under the IDEA. Implementation of these programs and practices resulted either in (1) a delay in referring children suspected of having a disability and needing special education and related services for an evaluation under the IDEA, or (2) a failure to refer children suspected of having a disability and needing special education and related services for an evaluation under the IDEA.

### III.    Findings of Noncompliance

1. TEA failed to ensure that all children with disabilities residing in the State who are in need of special education and related services were identified, located, and evaluated, regardless of the severity of their disability, as required by IDEA section 612(a)(3) and its implementing regulation at 34 CFR §300.111.
2. TEA failed to ensure that FAPE was made available to all children with disabilities residing in the State in Texas's mandated age ranges (ages 3 through 21), as required by IDEA section 612(a)(1) and its implementing regulation at 34 CFR §300.101.
3. TEA failed to fulfill its general supervisory and monitoring responsibilities as required by IDEA sections 612(a)(11) and 616(a)(1)(C), and their implementing regulations at 34 CFR §§300.149 and 300.600, along with 20 U.S.C. 1232d(b)(3)(A), to ensure that ISDs throughout the State properly implemented the IDEA child find and FAPE requirements.

### IV.    State Laws

Subsequent to the monitoring visit, the Texas legislature passed, and Governor Abbott signed, two State laws related to issues included in this report that became effective immediately. Texas S.B. 160 prohibits the use of a performance indicator based on the number or percentage of children who receive special education services. Texas S.B. 1153 requires each school district to notify parents if their child receives assistance through the use of intervention strategies. An "intervention strategy" is defined in the law as "a strategy in a multi-tiered system of supports that is above the level of intervention generally used in that system with all children." RTI is included within this term. The notice parents receive must contain a description of the assistance being

Page 14 – Enclosure to Texas Part B 2017 Monitoring Visit Letter

provided, and any intervention strategies employed, as well as an estimate of how long the child will receive assistance through the use of intervention strategies.  Texas S.B. 1153 also gives parents the right, as part of their entitlement to all written records, to access to any records relating to assistance provided or any information collected regarding any intervention strategies.

## V.   **Corrective Action/Next Steps**

Within a timeframe agreed to by OSEP and TEA upon the issuance of this letter, the State must provide OSEP with each of the following.

1. Documentation that the State's system of general supervision requires that each ISD identifies, locates, and evaluates all children suspected of having a disability who need special education and related services, in accordance with section 612(a)(3) of the IDEA and its implementing regulation at 34 CFR §300.111, and makes FAPE available to all eligible children with disabilities in accordance with section 612(a)(1) of the IDEA and its implementing regulation at 34 CFR §300.101.
2. A plan and timeline by which TEA will ensure that each ISD will (i) identify, locate, and evaluate children enrolled in the ISD who should have been referred for an initial evaluation under the IDEA, and (ii) require IEP Teams to consider, on an individual basis, whether additional services are needed for children previously suspected of having a disability who should have been referred for an initial evaluation and were later found eligible for special education and related services under the IDEA, taking into consideration supports and services previously provided to the child.
3. A plan and timeline by which TEA will provide guidance to ISD staff in the State, including all general and special education teachers, necessary to ensure that ISDs (i) ensure that supports provided to struggling learners in the general education environment through RTI, Section 504, and the State's dyslexia program are not used to delay or deny a child's right to an initial evaluation for special education and related services under the IDEA; (ii) are provided information to share with the parents of children suspected of having a disability that describes the differences between RTI, the State dyslexia program, Section 504, and the IDEA, including how and when school staff and parents of children suspected of having a disability may request interventions and/or services under these programs; and (iii) disseminate such information to staff and the parents of children suspected of having a disability enrolled in the ISD's schools, consistent with 34 CFR §300.503(c) .
4. A plan and timeline by which TEA will monitor ISDs' implementation of the IDEA requirements described above when struggling learners suspected of having a disability and needing special education and related services under the IDEA are receiving services and supports through RTI, Section 504, and the State's dyslexia program.